UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

AUSTIN CHAPPELL,

    Defendant.

Case No.

HON. MARK A. GOLDSMITH

_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATIONS (Dkt. 22)**

Before the Court is Defendant Austin Chappell's motion to suppress identifications (Dkt. 22). For the reasons set forth below, the Court denies the motion.[1]

**I. BACKGROUND**

Chappell is charged with felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Indictment (Dkt. 10). His motion to suppress challenges evidence and testimony related to certain out-of-court eyewitness identifications.

The parties agree on the following central facts. On April 4, 2023, Detroit Police Officers Alexander Gunther, Alexander Kavalos, and Alisea Houston attempted a traffic stop on an Audi with defective taillights. Br. Supp. Mot. at 1; Resp. at 3. The Audi drove onto the front lawn of a house. Br. Supp. Mot. at 1; Resp. at 3. The officers observed the driver jump out of the still-

---

[1] In addition to the motion to suppress identifications, the briefing includes the Government's response (Dkt. 24) and supplemental briefs (Dkts. 33, 41, 43) and Chappell's supplemental briefs (Dkts. 31, 40, 44). The Court held hearings on the motions on March 14, 2024, April 16, 2024, and November 25, 2024.

moving vehicle and run.  Br. Supp. Mot. at 1; Resp. at 3.  Kavalos followed the driver on foot as he approached a fence.  Br. Supp. Mot. at 1; Resp. at 3.  The driver jumped the fence, at which point Kavalos says he saw a pistol fall out of the driver's pocket.  Br. Supp. Mot. at 1; Resp. at 3.  Kavalos jumped the fence but soon lost sight of the driver.  Br. Supp. Mot. at 1; Resp. at 3.  Kavalos returned to the fence area and picked up the dropped pistol.  Resp. at 3.

At some point during or immediately after these events, the officers checked the registration of the Audi and saw that the registered owner was Daquan Paymond.  Br. Supp. Mot. at 2; Resp. at 4.  Kavalos viewed a picture of Paymond and confirmed verbally that he believed Paymond was the driver he had followed on foot.  Br. Supp. Mot. at 2–3; Resp. at 4.  Another officer, Officer Timothy Raynal, then arrived at the scene as backup.  Br. Supp. Mot. at 3; Resp. at 4.  Raynal informed the officers that he had stopped the same Audi the night before, but that Austin Chappell, not Paymond, was driving the car when he stopped it.  Br. Supp. Mot. at 3; Resp. at 4.  Kavalos was then shown a picture of Chappell and changed his earlier assessment, deciding that the driver he followed on foot was actually Chappell, not Paymond.  Br. Supp. Mot. at 4; Resp. at 5.  Kavalos explained that his earlier identification was incorrect because Chappell "had shorter hair."  Br. Supp. Mot. at 4; Resp. at 5.

Roughly one to two weeks later, Officer Brandon Byas presented a six-photo array to Kavalos, during which Kavalos identified Chappell as the offender.  Br. Supp. Mot. at 4; Resp. at 5.  Chappell was arrested shortly thereafter.  Resp. at 5.

Chappell moves to suppress (i) the out-of-court identification of Chappell by Kavalos on April 4, (ii) the subsequent out-of-court identification of Chappell by Kavalos after being shown a six-photo array, and (iii) any additional evidentiary or testimonial fruits of either identification.  Mot.  He argues that the identifications were unlawfully procured as the result of unduly suggestive

2

procedures. Id. The Court disagrees with Chappell, finding instead that both identifications were not the product of unduly suggestive circumstances.

## II. ANALYSIS

Due process protects the accused against the introduction of evidence which results from an unreliable identification obtained through unnecessarily suggestive procedures. Moore v. Illinois, 434 U.S. 220, 227 (1977). To determine whether an identification procedure violates due process, courts look first to whether the procedure was impermissibly suggestive; if so, courts then determine whether, under the totality of circumstances, the suggestiveness has led to a substantial likelihood of an irreparable misidentification. Kado v. Adams, 971 F. Supp. 1143, 1147–1148 (E.D. Mich. 1997) (citing Neil v. Biggers, 409 U.S. 188, 196-197 (1972)). Five factors should be considered in determining the reliability of identification evidence: (i) the witness's opportunity to view the perpetrator at the time of the crime; (ii) the witness's degree of attention at the time of the crime; (iii) the accuracy of the witness's prior descriptions of the perpetrator; (iv) the witness's level of certainty when identifying the suspect at the confrontation; and, (v) the length of time that has elapsed between the time and the confrontation. Neil, 409 U.S. at 199–200.

The defendant has the initial burden of proving that the identification procedure was impermissibly suggestive. See United States v. Hill, 967 F.2d 226, 230 (6th Cir. 1992). If a defendant meets this burden, then the Court must determine whether the identification was independently reliable. Id. So long as there is not a substantial misidentification, it is for the jury or factfinder to determine the ultimate weight to be given to the identification. Id. Here, Chappell fails at step one because he is unable to prove that either identification was impermissibly suggestive. But even if Chappell were to succeed at step one, the Government has shown that both identifications were independently reliable according to the Neil factors.

3

### A. The First Identification

Chappell argues that the first identification by Kavalos was impermissibly suggestive because Kavalos was shown only a single photograph—one of Chappell—and then asked to identify Chappell as the driver who ran away from the car. Br. Supp. Mot. at 8. Chappell cites Simmons v. United States, 390 U.S. 377, 383–384 (1968), in which the Supreme Court warned that the danger of an incorrect identification by a witness is increased "if the police display to the witness only the picture of a single individual who generally resembles the person [the witness] saw[.]" But as Chappell admits, Br. Supp. Mot. at 9, Simmons did not prohibit the use of single-photograph identifications. Instead, the Supreme Court held that "each case must be considered on its own facts[.]" Simmons, 390 U.S. at 384.

The facts of this case support a finding that the single-photo identification was not impermissibly suggestive. For one, Kavalos is a trained police officer, not a lay witness to a crime. As the Sixth Circuit has explained, trained police officers "[can] be expected to be careful in noting the appearance of a person before [them]." United States v. Parton, 225 F.3d 660 (6th Cir. 2000). This tends to make Kavalos's identification more reliable. See also United States v. Fields, 871 F.2d 188, 195 (1st Cir. 1989) (explaining that a police officer "would have been aware of the importance of an accurate identification because of his training and experience" and therefore concluding that the officer "was sufficiently attentive").

In addition, the identification occurred in the heat of the officers' pursuit for the runaway driver, whom the officers believed might have been armed and dangerous. As other courts have explained, such an identification is a sign of good police work. See, e.g., Valtin v. Hollins, 248 F. Supp. 2d 311, 318 (S.D.N.Y. 2003) ("[A]s opposed to police-arranged lineups, prompt confrontation is desirable because it serves to [e]nsure the immediate release of an innocent suspect

4

and at the same time to enable the police to resume the search for the fleeing culprit while the trail is fresh.") (punctuation modified); United States v. King, 148 F.3d 968, 970 (8th Cir. 1998) ("Police officers need not limit themselves to station house line-ups when an opportunity for a quick, on-the-scene identification arises . . . . Absent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations.") (punctuation modified); Mathis v. Howes, No. 2:09-CV-11265, 2010 WL 330373, at *7 (E.D. Mich. Jan. 21, 2010) (collecting cases).

Chappell argues that the identification was "wholly unnecessary" because "the suspect had likely gone home and could be tracked down later, and perimeters and canine teams were no longer necessary or useful." Br. Supp. Mot. at 12. But this assessment is made only with the benefit of hindsight. At the time, the officers did not know whether Chappell was still in the area, presenting a danger to others. It would not have been reasonable to expect them to conduct a police-station line-up or photo array instead of a prompt identification when it became clear that Raynal had stopped the same Audi the night before and might have had information regarding the driver, whom the officers believed might be armed.[2] This is supported by Gunther's testimony that he saw the driver with an L-shaped object that he believed to be a gun, 3/14/24 Tr. Vol. 1 at 17–18 (Dkt. 37), and Kavalos's testimony that there were spent shell casings on the ground after the runaway driver jumped the fence, 4/16/24 Tr. Vol. 2 at 77 (Dkt. 38).

---

[2] Chappell also cites Jackson v. City of Detroit, No. 18-14009, 2022 WL 4665900, at *1 (E.D. Mich. Sept. 30, 2022), as relevant precedent. Br. Supp. Mot. at 10–11. Jackson was a civil case where the court held that a single-photo identification of the plaintiff was impermissibly suggestive. Jackson, 2022 WL 4665900, at *6–*8. But Jackson does not help Chappell. For one, Jackson is an unreported district court opinion that is not binding on this Court. Further, the witness who made the identification in Jackson was a civilian minor, not a trained police officer like Kavalos. Id. at *1–2. In addition, the plaintiff in Jackson did not match the witness's description of the suspect. Id. For these reasons, Jackson is distinguishable from the case at hand.

For these reasons, the Court finds that the first identification was not impermissibly suggestive. But even if the Court found otherwise, the Neil factors show that the identification was independently reliable.

As already discussed, Kavalos is a trained police officer. He testified that he saw the driver when the driver initially got out of the car, and then had another good view of the driver when the driver dropped an object an attempted to pick it up. 4/16/24 Tr. Vol. 2 at 75–76. While it was dark out, Kavalos testified that there was some sort of outdoor lighting that allowed him to see the driver's face. Id. Given Kavalos's training, this was a sufficient opportunity to view the driver. In addition, Kavalos's sole focus was on the fleeing driver, and his identification was made shortly after watching the driver jump over the fence while his view of the driver was still fresh on his mind. This is supported by the fact that after viewing Chappell's photograph, Kavalos was "very confident" in his identification. Id. at 86. Further, the night of the incident, Gunther described the driver as a roughly six-foot tall Black man, which accurately describes Chappell and lends credibility to the identification. 3/14/24 Tr. Vol. 1 at 16. All of these factors suggest that Kavalos's identification was reliable.

Chappell emphasizes that Kavalos initially identified the driver as Paymond, the registered owner of the car, based on a different photograph that he was shown first. Br. Supp. Mot. at 12. According to Chappell, this makes Kavalos's later identification of him less reliable. Id. The Court disagrees. After seeing two photographs of individuals related to the Audi—one of the registered owner and another of the individual who had been driving the car the night before— Kavalos identified Chappell as the fleeing driver. To that end, Kavalos's identification was not based on a single photo, as Chappell contends. If anything, this tends to make Kavalos's

6

identification more, not less, reliable. For all of these reasons, the Court finds that the first identification was not unduly suggestive.

### B. The Second Identification

Chappell also argues that the six photo-array conducted by Byas in which Kavalos again identified Chappell as the driver was impermissibly suggestive. In his original motion, Chappell argues that the array was "unduly suggestive even before it was assembled" because of the earlier single-photo identification. Br. Supp. Mot. at 10. But as already discussed, the Court finds that the earlier single-photo identification was not impermissibly suggestive. The second identification, therefore, was not tainted by the first.

In his supplemental brief, Chappell makes additional arguments related to the specific procedures used during the array. Def. First Suppl. Br. at 2–6 (Dkt. 31). Chappell argues that the array violated Detroit Police Department procedures in the following ways:

1. Byas did not interview Kavalos prior to conducting the array to provide clarity that Kavalos had actual recollection of the suspect.

2. Prior to showing Kavalos the array, Byas unnecessarily commented that features such as a suspect's hair might change, but a nose would not.

3. The picture of Chappell used during the six-photo array was the same picture shown to Kavalos the night of the incident during which his first identification was made.[3]

4. The procedure was neither blind nor double-blind because Byas "seems to have been working this case as an investigator."

5. Byas provided no information "as to how or by whom the photo array was constructed," so it is "impossible to ascertain whether the photos used were not a mix of mug shots and

---

[3] The Court notes that Chappell does not suggest that a different photograph should have been used during the six-photo array instead of his LIEN photo. See Def. Third Suppl. Br. at 5 (Dkt. 44). Chappell argues simply that "the best [Byas] could have done . . . would have been to decide that a reliable photo array was no longer possible, and decline to conduct the procedure." Id. But it is unrealistic to argue that the officer who had the best view of the suspect the night of the attempted traffic stop should never be permitted to identify that suspect again. This view is unworkable and would make police work impossible.

7

      other photos, or whether the photos were taken contemporaneously to the time of the alleged crime."

6. Any steps taken off-camera to ensure that the procedures conformed with DPD policy were not video or audio-recorded.

Id.

In response, the Government argues that the photo line-up was "conducted pursuant to [DPD] policies and consistent with established protocols," pointing out that six Black male photos were used in the array, all depicting men of similar age and with similar hairstyles and facial hair. Gov. First Suppl. Br. at 2 (Dkt. 33). The Government contends that "Officer Byas did nothing which would suggest a particular photo be selected," id., and that his statement regarding certain features such as a suspect's hair and nose provided "no cues or information which would affect or influence" Kavalos's opinions, id. at 5. The Government also notes that (i) Byas did discuss Kavalos's recollection of the suspect before the interview and (ii) a double-blind presentation was not used because there were no other officers available to assist with the photo array. Id. at 3–4. At the evidentiary hearing, Byas testified that after his conversation with Kavalos regarding whether he was able to see Kavalos the night of the incident, he was satisfied that a lineup could be effective. 4/16/24 Tr. Vol. 2 at 16. He also testified that at the time of the line-up, the DPD typically conducted single-blind line-ups. Id. at 18–19.

The Court agrees with the Government that the procedures used for the six-photo array were not unnecessarily suggestive as to warrant suppression of the identification. Just because the array did not follow all DPD policies does not mean that Chappell's constitutional rights were violated. See, e.g., Salter v. Olsen, 605 F. Supp. 3d 987, 1011 (E.D. Mich. 2022) ("To be clear, violation of this [DPD identification] policy on its own . . . does not create a constitutional violation."). The six-photo array was videotaped by Byas's body camera and the jury will be able

to view the footage themselves and weigh the credibility of the identification. "Identification evidence is for the jury in all but extraordinary cases," United States v. De Leon-Quinones, 588 F.3d 748, 753 (1st Cir. 2009) (punctuation modified), and this is not one of those extraordinary cases.[4]

### III. CONCLUSION

For the reasons stated above, the Court denies Chappell's motion to suppress (Dkt. 22).

SO ORDERED.

Dated: February 12, 2025　　　　　　　　　　s/Mark A. Goldsmith
　　　　Detroit, Michigan　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[4] Because the Court finds that both identifications were not unnecessarily suggestive, there is no need to suppress any additional evidentiary or testimonial fruits resulting from either identification.